**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

HOOMAN ASHKAN PANAH,
          *Petitioner-Appellant*,

v.

KEVIN CHAPPELL, Warden of
California State Prison at San
Quentin,
          *Respondent-Appellee.*

No. 13-99010

D.C. No.
2:05-cv-07606-
RGK

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted June 26, 2019
Pasadena, California

Filed August 21, 2019

Before: Kim McLane Wardlaw, Jacqueline H. Nguyen,
and John B. Owens, Circuit Judges.

Opinion by Judge Owens

# SUMMARY[*]

## Habeas Corpus

The panel affirmed the district court's denial of Hooman Panah's habeas corpus petition challenging his State of California conviction and sentence for the first-degree murder and sexual assault of an eight-year-old girl.

The district court granted a certificate of appealability as to Panah's claim brought pursuant to *Napue v. Illinois*, 360 U.S. 264 (1959), in which Panah, relying on post-conviction DNA reports, contended that he was prejudiced by the State's presentation of serology testimony which, he argued, the State knew was false and misleading. The panel held that the California Supreme Court reasonably rejected this claim. The panel held that even assuming there was no reasonable basis for the state court to deny the claim as to the first two *Napue* requirements – that the testimony was false or misleading, and that the State knew or should have known that – the panel could not say that it would be unreasonable to conclude that the testimony did not satisfy the third requirement – materiality. Observing that even setting aside the serology testimony, the case against Panah was devastating, the panel held that the California Supreme Court would not have erred in finding no reasonable likelihood that the testimony could have affected the verdict.

The panel expanded the certificate of appealability to encompass Panah's claim that his trial counsel rendered

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

ineffective assistance by failing to conduct a reasonable investigation and therefore not rebutting the State's serology and pathology evidence. The panel expressed concern with counsel's lack of pre-trial investigation, but held that even assuming counsel's performance was deficient, it could not say – in light of the overwhelming evidence of Panah's guilt and the deference owed the state court judgment – that the California Supreme Court would have erred in finding no reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

## COUNSEL

Joseph A. Trigilio (argued), Mark R. Drozdowski, and Susel B. Carrillo-Orellana, Deputy Federal Public Defenders; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; Firdaus F. Dordi, Los Angeles, California; for Petitioner-Appellant.

Toni R. Johns Estaville (argued), Ana R. Duarte, A. Scott Hayward, and Dana M. Ali, Deputy Attorneys General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

**OPINION**

OWENS, Circuit Judge:

California state prisoner Hooman Panah appeals from the district court's denial of his habeas corpus petition challenging his conviction and sentence for the first-degree murder and sexual assault of eight-year-old Nicole Parker. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I. Background

### A. Murder & Sexual Assault of Parker

In the early afternoon of November 20, 1993, Parker went missing from her father's apartment complex, where Panah also lived with his mother. While searching for her in the complex, Parker's father knocked on Panah's door and asked if Panah had seen her. Panah responded something like, "oh, is she missing." He then offered to help Parker's father look for her, "persistent[ly]" suggesting they search outside the apartment complex. Soon after, the police arrived and conducted a door-to-door search for Parker, including Panah's apartment. The police did not find Parker or any clues as to her whereabouts.

That day, Panah reported to work in the mid-afternoon. Around 5:30 pm, his mother, who was with two police officers, called Panah. The officers asked him if he knew Parker or had seen her that day. He responded that he knew her only "vaguely" and denied having seen her that day. Shortly after the officers' inquiry – hours before his shift ended – Panah left work without telling anyone. He later called his manager to say that he would not return "because some people that he knew [were] trying to get him in trouble and would [his manager] please inform his mother to get out

of town." Panah also paged his co-worker, Rauni Campbell, asking for help. He told her that he "d[id] something very bad," "so big" that she would find out.

The next morning, Panah showed up without warning at Campbell's apartment. His wrists were cut, and he requested sleeping pills, which she helped him buy. Campbell asked Panah if he had anything to do with "the little girl that was missing from his apartment complex." He said yes. She then asked him whether Parker was still alive. He said no. At this point, Campbell surreptitiously called the police. When they arrived, Panah tried to evade arrest but was eventually caught and taken to the hospital. At the hospital, under the influence of drugs and reportedly in a psychotic state, Panah told police, in response to questions about Parker, that he "liked her very much, even [to] carry her skeleton remains around."

Later that evening, the police, armed with a search warrant, returned to Panah's apartment. In his bedroom closet, they found Parker's naked body, wrapped in a bedsheet and stuffed in a suitcase. The police then gathered evidence from Panah's bedroom, including examining his bed and Parker's body for evidence of sexual assault.

Panah was indicted on charges of first-degree murder with special circumstances alleging that the murder occurred during a kidnapping, sodomy, lewd acts on a person under fourteen years old, and oral copulation of a person under fourteen years old. He was also charged with the substantive counts of kidnapping, sodomy by force, lewd acts on a person under fourteen years old, penetration of genital or anal openings by a foreign object with a person under fourteen years old, and oral copulation of a person under fourteen years old. Panah pled not guilty.

## B. Pre-Trial Proceedings

Panah was initially represented by a family friend, Syamak Shafi-Nia, who had limited criminal law experience. But prior to trial, the court appointed Robert Sheahen, a veteran criminal lawyer, as lead counsel, and allowed Shafi-Nia to stay on as second counsel. Sheahen had requested this appointment, promising the court that he would facilitate a settlement, which would "save[] a great deal of time and the taxpayers would be saved a great deal of money" by avoiding "an extremely costly trial."

In July 1994, several months before trial, the State notified the court and defense that it had ordered DNA testing on evidence found at the crime scene. While awaiting the test results in September, the court urged Sheahen to "find a DNA expert to assist you" and "see if there's any basis for questioning the results." In October, two months before trial, the State shared the DNA test results with the defense. Again, the court advised Sheahen to retain an expert, to which Sheahen responded, "That will be taken care of."

However, as trial approached, the State decided not to introduce the DNA evidence. The court pressed defense counsel why he had not yet independently tested the DNA. Counsel explained that doing so "would put us in the position of confirming the prosecution results," and that he instead planned to argue that the State's "failure to do DNA testing should be held against" them. The court approved of this strategy, calling counsel's "tactics . . . very sound in this particular case."

## C. Trial

Panah's trial began on December 5, 1994. With jury selection set to begin, Sheahen notified the court that Shafi-Nia was no longer able to serve as second counsel but did not request a continuance. Accordingly, Panah began jury selection with just one lawyer. Shortly after, the court appointed new second counsel to replace Shafi-Nia, but second counsel was required to familiarize himself with the case during trial.

### i. Case-in-Chief

The State's theory was felony murder. It emphasized the abundance of circumstantial evidence against Panah and focused on "Parker's body bloody and battered," which was "tied up in a sheet inside a zipped suitcase" in Panah's closet. It also highlighted Panah's incriminating behavior soon after Parker went missing, including that Panah was "anxious" to encourage Parker's father to search outside the apartment complex; "had fled" work hours before his shift ended after receiving a call about Parker from his mother and police; and made numerous admissions about his involvement in Parker's murder. Panah's manager and Campbell testified about his statements on the day of and after Parker's disappearance.

The State also presented forensic evidence as part of its case-in-chief.

### a. Pathology Evidence

The coroner, Dr. Heuser, testified that Parker's physical injuries occurred premortem. Describing the violent nature of the assault, she explained that Parker suffered "blunt force" injuries, including bruising on her forehead, eye,

neck, lip, arms, and buttocks; scratches on her inner thighs; and brain swelling. Dr. Heuser also testified to Parker's sexual assault injuries. Parker had bruising, as well as signs of bleeding and tears, in the vaginal and rectal areas. Her vaginal opening was "very widely" open – most likely consistent with digital penetration. Her anal opening was also "widely open and very lax looking," "consistent with the insertion of a penis into her rectum."

Dr. Heuser also testified that Parker's death was due to "traumatic injuries," either the result of "manual strangulation" or force to Parker's rectum.

### b. Serology Evidence

Serologist William Moore testified about stains found on three items in Panah's bedroom: (1) the bedsheet Parker was wrapped in, (2) a robe found on Panah's bed,[1] and (3) a tissue from a wastebasket in Panah's bathroom. Preliminarily, Moore noted that Panah's blood type was B and Parker's was A. Because his testing discovered that stains on each item contained a mixture of A and B antigens, Moore posited that this was consistent with a mixture of Parker's and Panah's bodily fluids and thus sexual contact between them.

As to the bedsheet, Moore described the stains as "indicative of a mixture of physiological fluids" – blood, semen, and amylase (a constituent of saliva and other bodily fluids) – that included both A and B antigens. Because the bloodstain was "consistent" with Parker's type A blood, he surmised the other stains were consistent with semen from Panah and saliva from Parker. He also noted that the pattern

---

[1] The district court's opinion calls the robe a kimono.

of the stains "could . . . be consistent with the spewing of semen across the bed sheet."

Moore similarly testified that the tissue "bore semen stains, and high amylase activity," likely from a mix of Parker's and Panah's bodily fluids.  Again, he remarked that this stain "could be consistent with the product of an oral copulation."  Lastly, he testified that Panah's robe had a large stain with a mix of A and B antigens.  Because the robe's bloodstain was consistent with Parker, he hypothesized that the B antigens came from Panah's saliva.

Moore also briefly testified about evidence collected from the sexual assault examination, although he did not conduct it.  He acknowledged that the oral and anal swabs had not produced any signs of semen, nor was "the presence of semen conclusively" found anywhere on Parker's body.

On cross-examination, Moore admitted that he could not "establish any certainty" that either Parker or Panah was a contributor to the stains because of the relatively high statistical frequency of the A and B antigens matching other people.  Moore further testified that his theory would not bear out if the A and B antigens on the three items came from one person with AB blood type.[2]

### ii.    Defense's Evidence

The defense consisted of testimony from Dr. John Palmer, the emergency room doctor who treated Panah the day after Parker went missing, and several character witnesses.  Dr. Palmer reported that Panah was "acutely

---

[2] After the State presented its case, the court granted the defense's motion for acquittal on the substantive charges of kidnapping and the special circumstance allegation of kidnapping.

psychotic" and suicidal when brought into the emergency room that day.

### iii.  Closing Arguments

The State summarized its evidence: "We have blood typing that matches.  We have the body in his suitcase in his closet, and we have statements he makes that show knowledge before the body was found.  We have his involvement in the crime clearly established."  The State focused on where Parker's body was found: "You have a body in his closet, in his suitcase.  There isn't a whole lot more you need to do after that in terms of looking and investigating outside of the obvious, which is that Mr. Panah is the person involved."  It also focused on Panah's statements after Parker went missing: "Those aren't crazed remarks.  Those are the remarks of an individual who is telling exactly what happened."  The State then reminded the jury of Moore's testimony, arguing it was "not a harebrained prosecution theory."  It particularly used his testimony to prove the alleged oral copulation:

> We think the evidence that was presented to you is very consistent with the fact that he ejaculated in her mouth, that he allowed her to spit it out in a Kleenex, because we have the evidence of semen of his blood type, high amylase content, indicating a saliva which matches her blood type on the Kleenex, as well as having a spattering on the bed sheet of a mixture of semen and saliva – again the high amylase indicating saliva – of his type B and her type A.

It also said that "the one possible inference that can be drawn" from Moore's testimony about the robe is that the B

antigens came from "the saliva of the defendant" during the sodomy.

Acknowledging that none of this was "conclusive evidence," the State argued that, "when taken with everything else[, this] would indicate that there had been an act of oral copulation, that there was ejaculate in Nicole Parker's mouth." The State also responded to the defense's assertion that its case was weak because of the lack of DNA, claiming that DNA testing is "usually ordered in a situation where you don't have other types of proof available. In this situation we have the proof available."

In its closing, the defense questioned the reliability of the serology evidence, calling Moore's theory "hogwash," and insisted that the stains proved nothing. Rather, counsel highlighted the lack of DNA evidence, which "could tell us who's the source of this stuff . . . [and] whether it, in fact, could be traced to the deceased or whether it could be traced to any number of other people."

### iv.  Verdict

The jury convicted Panah of first-degree murder and the other felonies. The jury also found true the special circumstance allegations that the murder was committed while engaged in the crime of sodomy and lewd acts on a person under the age of fourteen. The jury did not find true the special circumstance allegation that the murder occurred in the commission of oral copulation. After the penalty phase, the jury returned a death sentence.

### D. Post-Trial Proceedings

On March 14, 2005, the California Supreme Court affirmed Panah's conviction and sentence, *People v. Panah*,

107 P.3d 790 (Cal. 2005), and the United States Supreme Court subsequently denied certiorari, *Panah v. California*, 546 U.S. 1216 (2006).  About a year later, the California Supreme Court summarily denied Panah's first habeas petition.  After filing a protective habeas petition in the District Court for the Central District of California, Panah filed a second state habeas petition and a first amended petition in the district court.  The district court stayed proceedings during the pendency of Panah's state habeas proceedings.  On March 16, 2011, the California Supreme Court again summarily denied Panah's second state habeas petition, and the district court lifted the stay on Panah's federal habeas proceedings.

In his habeas petitions, Panah provided new evidence, including two reports detailing post-conviction DNA testing on the stains that Moore testified about at trial.  The first report ("Calandro Report"), prepared in 2004, disagreed with much of Moore's testimony.  But because the Calandro Report yielded several inconclusive results, additional testing was conducted two years later, leading to the second report ("Inman Report").  Both reports doubted the foundation of Moore's mixture theory.  The Calandro Report called "Mr. Moore's approach . . . biased and indefensible," and the Inman Report wrote that "[n]o biological evidence exists to support the hypothesis that a mixture of biological fluids from Mr. Panah and Ms. Parker was present on the tissue, bedsheet, or kimono."

More specifically, both reports "contradict[ed]" Moore's testimony about the tissue.  While Moore testified that Panah and Parker were both possible contributors to the tissue stain, the reports eliminated any possibility that Parker was a source.  On appeal to this court, the State concedes that Moore's tissue testimony was false.

However, the post-conviction testing produced inconclusive results regarding the bedsheet and robe stains. Neither report could definitively eliminate Parker as a contributor to several stains on the bedsheet. While they conclusively found that two stains were consistent only with Panah, they could not conclusively rule Parker out as a contributor to the three other bedsheet stains. Although this left open the possibility that Moore's mixture theory was correct, the reports opined that this at minimum refuted his assumption that "Ms. Parker 'spit out' ejaculate onto the bed sheet" because one would then expect to "detect Ms. Parker's DNA in significant quantities on the bed sheet." As for the robe, the reports agreed with Moore that the bloodstain was consistent with Parker's blood type. But, unlike Moore's serology testimony, they found no trace of Panah's DNA on the robe.

Panah's habeas petitions also included declarations from his three trial lawyers. Each declaration acknowledged there had been almost no pre-trial investigation and only a limited penalty-phase investigation, nor were any experts retained to independently analyze the State's serology and pathology evidence. Instead, "all of [defense counsel's] efforts had gone into the aborted settlement."

On November 14, 2013, the district court denied Panah's petition. As for Panah's *Napue v. Illinois*, 360 U.S. 264 (1959), claim, the district court held that, even if post-conviction DNA testing rendered a portion of Moore's testimony false, the California Supreme Court could have reasonably concluded that it did not render all of the testimony false and that his testimony was immaterial in light of the other evidence. In this discussion, the district court also rejected Panah's claim of ineffective assistance for failure to investigate the State's forensic evidence because

the California Supreme Court reasonably could have concluded that Panah was not prejudiced.

The district court granted a certificate of appealability ("COA") for Panah's *Napue* claim, discussed below in section III. On appeal, Panah has raised a number of uncertified issues in his opening brief, which we treat as a request to expand the COA. 9th Cir. R. 22-1(e). After asking the State to respond to several of the uncertified issues, we expand the COA to encompass Panah's guilt-phase ineffective assistance claim, addressed below in section IV, but deny Panah's request to expand the COA as to the other uncertified claims. We evaluate Panah's two certified claims in turn.

## II. Standard of Review

We review the district court's denial of habeas relief de novo. *Lewis v. Mayle*, 391 F.3d 989, 995 (9th Cir. 2004).

Because Panah filed his federal habeas petition after April 24, 1996, it is subject to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Murray v. Schriro*, 745 F.3d 984, 996 (9th Cir. 2014). Under AEDPA, we may grant relief only if the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

Although we typically "look through" a summary disposition to the last reasoned state court decision, *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991), here there is no reasoned state court decision addressing either certified

claim. Therefore, we independently review the record to determine whether the California Supreme Court had any reasonable basis to deny Panah relief. *See Reis-Campos v. Biter*, 832 F.3d 968, 974 (9th Cir. 2016) (citing *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

## III.   *Napue* Claim

Relying on the two post-conviction DNA reports, Panah contends that he was prejudiced by the State's presentation of Moore's serology testimony, which he argues the State knew was false or misleading.

In *Napue*, the Supreme Court held "that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." 360 U.S. at 269. Nonetheless, a *Napue* claim succeeds only if three elements are satisfied. *See United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003). First, the testimony or evidence in question must have been false or misleading. *See id.*; *see also Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (considering whether "testimony, taken as a whole, gave the jury [a] false impression"). Second, the State must have known or should have known that it was false or misleading. *See Zuno-Arce*, 339 F.3d at 889; *see also Maxwell v. Roe*, 628 F.3d 486, 506 (9th Cir. 2010) ("[E]ven false evidence presented in good faith . . . hardly comports with fundamental fairness." (quoting *Killian v. Poole*, 282 F.3d 1204, 1209 (9th Cir. 2002))). And third, because "*Napue* does not create a 'per se rule of reversal,'" the testimony or evidence in question must be material. *Sivak v. Hardison*, 658 F.3d 898, 912 (9th Cir. 2011) (quoting *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008)); *see also Zuno-Arce*, 339 F.3d at 889.

Materiality under *Napue* requires a "lesser showing of harm . . . than under ordinary harmless error review." *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013). But, after weighing the effect of alleged *Napue* violations collectively, *see Phillips v. Ornoski*, 673 F.3d 1168, 1189 (9th Cir. 2012), there still needs to be a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (en banc) (quoting *Belmontes v. Woodford*, 350 F.3d 861, 881 (9th Cir. 2003)). Thus, a *Napue* claim fails if, absent the false testimony or evidence, the petitioner still "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984 (quoting *Hall v. Dir. of Corr.*, 343 F.3d 976, 984 (9th Cir. 2003) (per curiam)).

Even if we assume there was no reasonable basis for the state court to deny Panah's claim as to the first two *Napue* requirements, we cannot say that it would be unreasonable to conclude that Moore's testimony was immaterial. *See Towery v. Schriro*, 641 F.3d 300, 308 (9th Cir. 2010) (not reviewing all three requirements because petitioner's "argument fails at the second *Napue* prong"). The State presented a powerful case of Panah's guilt, with substantial evidence linking him to Parker's murder and sexual assault. Moore's testimony was just one – and not a crucial – piece of that presentation. Because the "verdict" is still reasonably "worthy of confidence," *Phillips*, 673 F.3d at 1189 (quoting *Sivak*, 658 F.3d at 912), we hold that the California Supreme Court would not have erred in finding no "reasonable likelihood that [Moore's testimony] could have affected the judgment of the jury." *Hayes*, 399 F.3d at 985 (quoting *Belmontes*, 350 F.3d at 881); *see also Phillips*, 673 F.3d at 1190 ("[T]he prosecution's *Napue* violations, although 'pernicious' and 'reprehensible,' were not material to

[petitioner's] conviction of first-degree murder." (quoting *Hayes*, 399 F.3d at 981)).

Even setting aside Moore's testimony, the case against Panah was devastating. Parker's naked body was found in a suitcase in Panah's bedroom closet. Blood stains matching Parker's blood type – according to both Moore and the post-conviction reports – were found on Panah's robe. Moreover, Panah's behavior on the day of and after Parker went missing was highly suspicious. Hours after she disappeared, Panah tried to divert her father away from where her body was later found. Then, after the police called Panah at work to ask if he had seen Parker, he left without explanation, later telling his manager and Campbell that he was in serious trouble. The next morning, Panah even confided in Campbell that he was involved in Parker's death. *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) ("A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" (quoting *Bruton v. United States*, 391 U.S. 123, 139 (1968) (White, J., dissenting))). And then, particularly incriminating in light of his statements, Panah attempted suicide the morning after Parker's disappearance.

The jury then heard Dr. Heuser's impactful testimony about the crime itself. She described Parker's extensive injuries from the sexual assault, including significant trauma to Parker's vaginal and rectal areas, indicative of digital and penile penetration. In addition, Dr. Heuser described the violent nature of the assault: Parker was hit with "blunt force," consistent with her "head striking . . . a wall or a floor" or being hit with a "fist." As a result, Parker's brain was swollen from this "significant impact," and she had bruises – some caused by "manual strangulation" – along her face, neck, arms, buttocks, and legs, and scratches on her

legs. Dr. Heuser cited strangulation and sodomy as "the most lethal injuries."

Although Dr. Heuser's testimony did not directly implicate Panah, it was nonetheless critical. It established that a crime – and a brutal one – took place. When added to the evidence the jury heard about where Parker's body was found and Panah's statements, it was more than sufficient for the jury to render a guilty verdict. And, while Panah contends that Moore's testimony was prejudicial because of its at-times graphic descriptions, particularly of oral copulation, Dr. Heuser's testimony offered an even more graphic and detailed description of the entire sexual assault and murder. As the State itself said, Dr. Heuser's testimony is "probably the most telling evidence of what happened."

The state court also reasonably could have found Moore's testimony to be an immaterial part of the State's case because it offered the jury, at most, hypotheticals and wavering findings. Unlike Dr. Heuser's straightforward testimony about Parker's injuries, Moore acknowledged that his findings rested on a number of assumptions, such as that the A and B antigens came from two people rather than one with AB blood type. And even if he was correct that the A and B antigens came from two people, Moore neither could definitively say they came from Parker and Panah, nor could he even narrow the pool of possible matches to less than hundreds of thousands of people. He said frankly on the stand: "I cannot establish any certainty based on conventional serology. I can only demonstrate consistency." For this reason, Moore's testimony was couched in inconclusive terms, such as "could have originated from" or were "consistent" with. The State even acknowledged this weakness in Moore's findings in closing argument:

> Now the question is, did a person with AB blood leave . . . body fluids such as blood, semen[,] and saliva, on the sheets, on the toilet paper, on the robe.  That is one interpretation.  The other interpretation, of course, is that you have two separate people, one of whom has type A, and one has type B.

Therefore, at best, Moore's testimony required the jury to draw its own inferences.  This was not the case of impactful expert testimony telling the jury that there was a one-in-a-million chance the evidence matched anyone but Panah.  Rather, any effect Moore's findings may have had on the jury – which was reasonably none – was fully dependent on the other weighty evidence presented by the State.  For instance, without having found Parker's body in Panah's bedroom, no juror could have reasonably inferred that Parker was the A antigen contributor.

The jury's verdict removes any lingering doubt about the materiality of Moore's testimony.  If the State needed Moore's testimony at all, it was to prove the special circumstance allegation and substantive charge of oral copulation.  In its closing, for instance, the State referred to Moore's findings of mixed bodily fluids on the tissue and bedsheet to prove this sexual act.  Yet, the jury did not find true the special circumstance allegation that Parker's murder was committed while in the commission of oral copulation.  Although the jury did find Panah guilty of the felony of oral copulation, the verdict is still telling.  A reasonable interpretation of the jury's rejection of this special circumstance is that the jury was not entirely persuaded by Moore's mixture theory.  In contrast, this highlights the effectiveness of Dr. Heuser's testimony.  The State relied on her findings to prove the special circumstance allegations

and substantive charges of sodomy and lewd acts, which the jury found to be true.

Still, Panah contends that Moore's testimony was material because it was the only evidence identifying him as the perpetrator. Although creative, this argument makes little headway. It ignores the substantial evidence tying Panah to Parker's murder and sexual assault. This was not a case where the police had no leads on a suspect. Nor was it a case where the prosecution needed Moore's serology evidence to place Panah at the crime scene. Rather, as the State emphasized in its closing: "You have a body in his closet, in his suitcase. There isn't a whole lot more you need to do after that in terms of looking and investigating outside of the obvious, which is that Mr. Panah is the person involved." And, as previously mentioned, Panah's own admissions linked him to the assault. Thus, even without Moore's testimony, the State had no difficulty proving identity.

For these reasons, Panah's reliance on *Miller v. Pate*, 386 U.S. 1 (1967), is unavailing. In *Miller*, the petitioner was also charged with the murder and sexual assault of a young girl without any eyewitnesses to the crime. *Id.* at 2–3. The State's only evidence linking petitioner to the victim was male underwear, which an expert said had blood stains on it matching the victim, found near the crime scene. *Id.* at 3–4. Post-conviction testing proved the underwear stains were paint, not blood, and that the State had known this at trial. *Id.* at 5–6. The Supreme Court reversed petitioner's conviction because, while the State successfully used the underwear as "an important link in the chain of circumstantial evidence against the petitioner," in reality it was "virtually valueless as evidence." *Id.* at 4, 6.

*Miller* is clearly distinguishable. First, although the parties agree that the tissue testimony was false, post-conviction testing did not render the majority of Moore's testimony false. Neither post-conviction report conclusively refuted his findings as to the bedsheet or robe stains. Therefore, unlike in *Miller*, the evidence in question here did not become "virtually valueless" to convict. *Id.* at 6. Second, Moore's testimony was not the "important link" in proving Panah's guilt. *Id.* at 4. The State did not even need Moore's testimony to convict Panah. This case differs significantly from *Miller* because here the state court could reasonably rely on an abundance of other evidence to still have confidence in the conviction.

Panah's reliance on *Alcorta*, 355 U.S. 28, also is misplaced. There, the Court overturned petitioner's conviction because the false "testimony was seriously prejudicial to petitioner" and "tended squarely to refute his claim." *Id.* at 31. Had the false testimony been corrected, petitioner's defense would have been corroborated. But, here, even if Moore's testimony had been corrected or entirely excluded, the jury would not have heard a significantly different presentation of evidence. At most, although we think unlikely, the State's case may have become marginally weaker.

Rather, this case is quite similar to *Sivak*, 658 F.3d 898, in which we rejected a guilt-phase *Napue* claim because the court had "full confidence that the jury would still have convicted." *Id.* at 913. There, we held: "[E]ven if the jury disbelieved [the false testimony] entirely . . . there still is no 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Id.* at 914 (quoting *Jackson*, 513 F.3d at 1076). As in *Sivak*, we think the California Supreme Court reasonably still could have had

"full confidence" that the jury would have returned the same verdict even in absence of Moore's testimony.  *Id.* at 913.

In sum, we do not think Moore's testimony was critical in convicting Panah.  Excluding Moore's testimony, the State's case was still devastating and largely unchallenged. Moore's testimony was certainly not "the centerpiece of the prosecution's case."  *Hayes*, 399 F.3d at 985.  Rather, in light of the overwhelming evidence against Panah and the jury's rejection of the oral copulation special circumstance, it is reasonable to conclude that his testimony had essentially no effect on the jury's decision making.  *Cf. Dow*, 729 F.3d at 1049–50 (concluding that false testimony was material because "[t]he evidence against [petitioner] was weak"); *Maxwell*, 628 F.3d at 508 (holding that false testimony was material because it came from a "'make-or-break' witness for the State" and there was a "paucity of other evidence"); *Hall*, 343 F.3d at 984 (reversing under *Napue* "[i]n light of the already scant evidence on which the conviction was based").  As such, we conclude that the California Supreme Court reasonably rejected Panah's *Napue* claim.

## IV.   Ineffective Assistance of Counsel Claim

We next turn to Panah's guilt-phase ineffective assistance claim.  To prevail, Panah must show that his counsel's performance "fell below an objective standard of reasonableness" and "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).  "The likelihood of a different result," however, "must be substantial, not just conceivable."  *Richter*, 562 U.S. at 112.  This already imposing standard becomes doubly difficult to satisfy once AEDPA deference is tacked on.  *See Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) ("[T]he benchmark for judging any

claim of ineffectiveness [under *Strickland*] must be whether counsel's conduct *so undermined* the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (quoting *Strickland*, 466 U.S. at 686)).

Panah argues that his trial counsel was ineffective for failing to conduct a reasonable investigation and therefore not rebutting the State's serology and pathology evidence. In support of his claim, Panah notes that his counsel never retained an expert to independently analyze the pathology and serology evidence or to testify at the guilt phase. Instead, defense counsel essentially seemed to accept the State's evidence as true. In post-conviction proceedings, counsel acknowledged that his inordinate focus on settlement resulted in too little, if even any, pre-trial investigation.

While we are instructed to "avoid the temptation to second-guess [counsel's] performance," *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc), we are concerned with defense counsel's lack of pre-trial investigation. *See Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008) ("[L]awyers [have] considerable discretion to make strategic decisions about what to investigate, but only *after* those lawyers '*have gathered sufficient evidence upon which to base their tactical choices*.'" (quoting *Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002))). But we "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. Here, even assuming counsel's performance was deficient, we cannot say – in light of the overwhelming evidence of Panah's guilt *and* the deference we owe the state court judgment – that the

California Supreme Court would have erred in finding no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

After weighing counsel's deficiencies cumulatively with "the strength of the government's case," *Rios v. Rocha*, 299 F.3d 796, 808–09 (9th Cir. 2002) (quoting *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986)), we believe the state court reasonably rejected Panah's assertion that the trial's outcome "would have been dramatically different" had counsel's performance not been deficient.  Our reasoning on prejudice bears significant similarities to why we reject Panah's *Napue* claim.  We do not wish to harp on what was detailed in the preceding section, but the State had a uniquely strong case against Panah.  Parker's body was found in his bedroom; Panah's behavior the day of and after her disappearance was incriminating; Panah admitted his own involvement in her death; and Parker's serious physical injuries, including to her genitalia, were well-documented. Defense counsel even acknowledged that this evidence was the foundation of the State's case: "The critical pieces of evidence are obviously that the child's body is found in Mr. Panah's closet, her naked body with a considerable amount of blood.  There is evidence . . . that the child was beaten."

It is, therefore, inconceivable, even had defense counsel independently investigated the serology and pathology evidence, that the jury would have reached a different verdict. *See Williams v. Filson*, 908 F.3d 546, 570 (9th Cir. 2018) ("We have long recognized . . . that 'prejudice resulting from ineffective assistance of counsel must be "considered collectively, not item by item."'" (quoting *Doe v. Ayers*, 782 F.3d 425, 460 n.62 (9th Cir. 2015))).  Even if the weaknesses in Moore's and Dr. Heuser's findings that

came to light post-conviction were raised at trial, that would have done nothing to reasonably change the outcome. Not only was there no "strong, unequivocal, exculpatory evidence available," *Rios*, 299 F.3d at 813, but there was nothing to substantively challenge the serology or pathology evidence. It is true that counsel could have told the jury that Moore's findings as to the tissue were wrong. But counsel could not have refuted Moore's findings as to the bedsheet and robe stains, and even a different outcome on the felony of oral copulation would not affect Panah's guilty verdict and death sentence. Also, Panah's contention that he was prejudiced by counsel's failure to rebut Moore's mixture theory because it put him at the crime scene fails to acknowledge that finding Parker's body in his bedroom alone was sufficient to do that. Therefore, whatever rebuttal of the State's expert witnesses that Panah believes he was deprived of and thus prejudiced by would not have overcome the other significant evidence of guilt.

Moreover, for however deficient defense counsel's investigation was, the state court also could have reasonably found no prejudice because counsel adequately challenged the State's expert witnesses on the stand. *See Richter*, 562 U.S. at 111 ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation."). During Moore's cross-examination, defense counsel attempted to cast doubt on his findings. His questions pushed Moore to acknowledge the high statistical probability of persons other than Panah and Parker contributing to the stains, and that Moore could not even "determine when th[e] stains were deposited." Counsel also remarked that Moore offered nothing more than "inconclusive blood typing," hypothesized that Moore simply "construct[ed] some sort of theory whereby you can link that blood to Mr. Panah or to the deceased," and

questioned why the jury was "not offered DNA evidence." Notably, even one of the post-conviction reports described the cross-examination of Moore as "reasonably successful."

Similarly, we do not think there was anything in the defense's questioning of Dr. Heuser that would have changed the outcome. There was nothing to rebut her detailed testimony about Parker's extensive injuries. Panah instead alleges that he was prejudiced by counsel's failure to rebut Dr. Heuser's assessment of the cause and time of death. But at trial, counsel did flag concerns with this part of her testimony. Thus, we agree with the district court's conclusion that, "in light of the 'setting of a sexual assault,'" further challenging Dr. Heuser's testimony on the cause of death "would have been no more palatable to the jury."

As a result, the state court would not have unreasonably determined that counsel's casting-doubt strategy was appropriate, even effective, and thus found a lack of prejudice. With little to do about the State's formidable evidence against Panah, counsel still sought to inform the jury of weaknesses in the experts' testimony. *See id.* ("When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict."). And here the strategy even seems to have been somewhat successful, as the jury rejected the special circumstance allegation of oral copulation. Like in the *Napue* analysis, this is probative evidence that the jury did not give persuasive weight to the serology testimony, presumably because of defense counsel's strategy and cross-examination.

Our analysis is further guided by *Richter*, in which the Supreme Court rejected a similar ineffective assistance claim based on counsel's failure to present an expert to rebut the State's forensic evidence. *Id.* at 111–13. The Court's

reasoning is almost entirely applicable here. Holding that the petitioner was not prejudiced, the Court concluded that there was little chance of a different outcome because the post-conviction evidence did not exonerate petitioner and because some of petitioner's post-conviction evidentiary concerns were already raised by counsel at trial before the jury. The Court went on to determine – as is also applicable here – that the petitioner also did not prove any likelihood of a different outcome because he had done nothing to rebut the other "sufficient conventional circumstantial evidence pointing to [his] guilt."[3]  *Id.* at 113.

We do not hold that counsel should not have done more. But, based on the particular facts before us, we recognize there was "nothing more than a theoretical possibility" of a different verdict. *Id.* at 112. The evidence of Panah's guilt was so strong that there remained an "ample basis for the California Supreme Court to think any real possibility of [Panah's] being acquitted was eclipsed by the remaining evidence pointing to guilt." *Id.* at 113. Therefore, we affirm the district court's denial of Panah's ineffective assistance claim.

**AFFIRMED.**

---

[3] Panah's attempt to analogize his case to several out-of-circuit cases falls short. For instance, in *Elmore v. Ozmint*, 661 F.3d 783, 871–72 (4th Cir. 2011), the Fourth Circuit held that the petitioner was prejudiced by counsel's failure to investigate any of the prosecution's forensic evidence. But, there, "[t]he case was a real 'who-done-it,'" and, with a proper "investigation, the jury undeniably would have seen a drastically different – and significantly weaker – prosecution case." *Id.* at 861, 870. None of that is true here.