**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CHARLES CRAIG CLEMENTS,

*Petitioner-Appellant*,

v.

RAYMOND MADDEN, Warden; A MILLER, Warden,

*Respondents-Appellees*.

No. 22-55333

D.C. No.
8:14-cv-02002-DDP-JPR

OPINION

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted December 6, 2023
Pasadena, California

Filed August 9, 2024

Before: Kim McLane Wardlaw and Patrick J. Bumatay,
Circuit Judges, and Matthew F. Kennelly,[*] District Judge.

Opinion by Judge Kennelly;
Dissent by Judge Bumatay

---

[*] The Honorable Matthew F. Kennelly, United States District Judge for the Northern District of Illinois, sitting by designation.

# SUMMARY[**]

## Habeas Corpus

In Charles Clements's appeal from the denial of his habeas corpus petition under 28 U.S.C. § 2254, the panel reversed the district court's denial of Clements's claim under *Napue v. Illinois*, 360 U.S. 264 (1959), and remanded with instructions to grant the petition with respect to aggravated kidnapping charges.

The panel agreed with the parties and the district court that the *Napue* claim is subject to *de novo* review because the state court did not apply the governing standard for materiality established by the Supreme Court. The panel held that the prosecution violated *Napue* by permitting a jailhouse informant to testify that he had received no parole consideration for his actions and that his motives for coming forward were altruistic, when the prosecutors knew or should have known that this was false. As to materiality, the panel held that Clements met his burden of establishing "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury," where the informant's testimony was highly probative of Clements's consciousness of guilt and identity on the aggravated kidnapping counts, it was relevant regarding the criminal implications of his alleged aggravated kidnapping, and it went directly to the essential element of whether he created a substantial increase in risk to the victims.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Because Clements obtains via the *Napue* claim the relief he seeks—vacating the aggravated kidnapping charges—the panel did not address the request for an evidentiary hearing on Clements's claim under *Brady v. Maryland*, 373 U.S. 83 (1959).

To ensure a complete record, the panel addressed Clements's claims that the informant's testimony should have been excluded in its entirety because the prosecution violated *Massiah v. United States*, 360 U.S. 264 (1959), and that the prosecution's misconduct considered as a whole made the trial fundamentally unfair. The panel held that the district court's grant of deference under the Antiterrorism and Effective Death Penalty Act to the state court's determination of these claims was appropriate. Given the deferential standard, the panel affirmed the denial of the *Massiah* and prosecutorial misconduct claims. A reasonable jurist could determine after setting aside the informant's testimony that the other evidence was sufficient to establish Clements's guilt on all of the charges on which he was convicted.

Judge Bumatay dissented. He wrote that the majority waters down the materiality standard for *Napue*, seemingly equating materiality with anything that supports an element of the charged offense, contrary to precedent; lowers the materiality bar so low that it grants the habeas petition on grounds Clements conceded at trial; engages in rank speculation to elevate the importance of the informant's testimony; and creates confusion within the circuit on the proper *Napue* standards.

## COUNSEL

Dale F. Ogden Jr. (argued), Deputy Federal Public Defender; Cuauhtemoc Ortega, Federal Public Defender; Mark Drozdowski, Senior Habeas Litigator; Federal Public Defender's Office, Los Angeles, California; Marena Dieden, Certified Law Student, UCLA School of Law; Los Angeles, California; for Petitioner-Appellant.

Michael D. Butera (argued), Deputy Attorney General; Christopher P. Beesley, Supervising Deputy Attorney General; Charles C. Ragland, Senior Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the California Attorney General, San Diego, California; for Respondents-Appellees.

## OPINION

KENNELLY, District Judge:

Charles Clements was sentenced to two consecutive life sentences plus eighteen years after a California state jury convicted him of two counts of kidnapping to commit robbery (aggravated kidnapping), three counts of second-degree robbery, and related enhancements. He appeals the district court's denial of his federal habeas corpus petition, filed under 28 U.S.C. § 2254.

Clements asserts four claims for relief. They largely arise from post-trial revelations regarding a pattern of unconstitutional use of jailhouse informants in Orange County and the testimony of one such informant during Clements's trial. He argues that the prosecution

(1) presented false evidence in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), (2) improperly withheld favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), (3) used a jailhouse informant to elicit incriminating information after his right to counsel attached in violation of *Massiah v. United States*, 377 U.S. 201 (1964), and (4) engaged in prosecutorial misconduct that so infected the trial with unfairness that his conviction violated due process. Clements challenges only his aggravated kidnapping convictions, so we confine our analysis to those particular convictions.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Clements's claims. We review Clement's *Napue* claim *de novo* because the state court's analysis of this claim applied standards that were contrary to governing Supreme Court precedent, and we review his *Massiah* and prosecutorial misconduct claims with the deference AEDPA otherwise requires. We reverse the district court on Clements's *Napue* claim and grant his petition for habeas corpus with respect to his aggravated kidnapping convictions.

## Factual Background

On January 27, 2009, Clements entered the home of Bank of the West employee Alison Lopez under the guise of delivering a package. Lopez was seven and a half months pregnant at the time and had taken the day off work. Once inside, Clements pulled out a gun, pointed it at Lopez, and told her not to panic or do something stupid. Clements put gloves on and pulled a bandana over his face.

Clements told Lopez his ten-year-old son had been kidnapped by a gang that was making him rob the bank where she worked. He told Lopez that if she did not do as

he said, the gang would kill them, his son, and everyone who worked at the bank. As they discussed the robbery, Clements also told Lopez that she had to be the one to go into the bank and get the money, and that he would kill her if she did not cooperate. The package Clements was supposedly delivering contained a black trench coat, a black wig, a black laptop case, zip ties, a black duffel bag, and a second gun. He opened the package, pulled the second gun out and screwed a silencer onto it. As he did so, he told Lopez he could now kill her very quietly. Clements and Lopez were in her residence for about an hour before they went to the bank in Lopez's car. Clements drove, and Lopez was in the passenger seat.

Once at the bank, Clements had Lopez use her cell phone to call her coworker, Cindy Chin, to ask Chin to exit the bank and come to the car. Lopez moved to the driver's seat, and Clements stood nearby. When Chin arrived, Clements approached the car, told Chin not to look at him, and explained what was happening.

Clements gave Lopez the black duffel bag and told her to go into the bank and get the money. He gave her specific instructions to get money from the vault rather than from the tellers and not to take any dye packs or GPS devices. Lopez went into the bank while Chin remained in the car.

Clements was in the driver's seat and Chin in the passenger seat when Lopez returned with the black duffel bag containing cash from the bank vault; he instructed her to get into the back seat. He then drove toward a bowling alley where he said he was going to make the exchange for his son. After driving a short distance, he stopped the car on a side street, took the black duffel bag and the box out of the car, and told Lopez and Chin to drive back to the bank and

wait ten minutes before calling the police. Lopez then got into the driver's seat and drove back to the bank with Chin as directed.

The state initially charged Clements with two counts of aggravated kidnapping, three counts of second-degree robbery, and enhancements related to the firearm and the value of the money. It later added a solicitation to murder count based on the allegations of Donald Boeker, a jailhouse informant.

The defense unsuccessfully sought severance of the solicitation to murder charge. It argued that Boeker's inflammatory testimony related to the solicitation to murder charge would have a spillover effect on the robbery and kidnapping charges. In response, the prosecution argued that the counts were "directly related" to one another and that Boeker's testimony would be cross admissible on the kidnapping and robbery charges for several reasons. Most notably, the prosecution argued that Boeker's testimony was proof of Clements' identity—given that neither Lopez nor Chin could pick Clements out of a photo lineup—as well as consciousness of guilt and motive. The state trial court agreed that Boeker's testimony would be probative of consciousness of guilt on the robbery and kidnapping charges. The court denied Clements's motion for severance.

At trial, Boeker testified that he met Clements in April 2010 while they were housed in the same cell block of the Orange County jail. At the time, Boeker was in custody on charges of burglary, possession of stolen property, petty theft, and on a parole warrant. He testified that Clements told him that Clements was in custody on charges of bank robbery and kidnapping and that kidnapping was the more serious charge.

According to Boeker, Clements said he wanted money wrappers planted in Lopez's backyard, house, and car so that it would appear she was in on the robbery and not a victim of kidnapping.  Boeker replied that he still had a prison term to serve before being released, and Clements promised to "take care of" Boeker once he got out of custody.  He testified that Clements later asked him what kind of crimes he committed, and he made up a story that he killed "a couple of people" during a robbery.

Boeker also testified that Clements became obsessed with having Lopez killed and that he wanted her dead so she could not testify against him and there would be no kidnapping charge.  Boeker told Clements that would cost him, and Clements claimed to have money left over from the robbery and offered Boeker $10,000.  Boeker said that it could probably be arranged.  He testified that Clements wanted him to kill the woman's husband and baby as well.

The jury convicted Clements of the aggravated kidnapping and robbery charges and found true the firearm and property value allegations but could not reach a unanimous verdict for the solicitation of murder charge.  The court declared a mistrial as to the solicitation of murder charge and dismissed the count.

## Procedural History

On direct appeal before the California Court of Appeal, Clements challenged the sufficiency of the evidence, the joinder of solicitation for murder with the other counts, and a trial court order requiring him to pay restitution.

As relevant here, the court affirmed the denial of Clements's motion for severance.  It held that the fact "[t]hat defendant solicited the murder of a crucial prosecution

witness was highly probative of defendant's consciousness of guilt, which in turn was probative of his identity as the perpetrator." *People v. Clements*, No. G046314, 2013 WL 1233245, *7 (Cal. Ct. App. Mar. 27, 2013) (internal quotation marks omitted). Even if identity was not going to be a contested issue during the trial, "the prosecution was still required to prove defendant's identity and his effort to have Lopez killed so she could not testify tended to prove defendant's identity, as well as the criminal implications of his conduct." *Id.*

Clements petitioned the California Supreme Court for review, which that court summarily denied in 2013.

In 2014, Clements timely filed a *pro se* habeas corpus petition in federal court. Soon after, he obtained a stay to exhaust in state court new claims of prosecutorial misconduct and judicial bias. After exhausting those claims, Clements lodged a proposed first amended petition, which the district court ordered filed on June 30, 2015. After the Orange County informant scandal became public in 2016, Clements sought and was granted a second stay to exhaust in state court claims regarding the informant program as related to Boeker's role in his case. The scandal involved the Orange County Sheriff's Department's practice of using jailhouse informants to elicit incriminating statements from specific inmates who had been charged and were represented by counsel, in violation of the inmates' Sixth Amendment rights.

When Clements returned to federal court, he filed several *pro se* motions seeking discovery of documents related to his jailhouse-informant claims, as well as two motions for appointment of counsel. In May 2017, the district court appointed the Federal Public Defender to represent him.

Clements's discovery requests focused on obtaining Boeker's jailhouse-informant records, known as TRED records and Special Handling logs. TRED records refer to an inmate's internal record while in custody. They consist of "three-line computer entries regarding classification, interviews, separation orders, and housing movements." *California v. Dekraai*, 5 Cal. App. 5th 1110, 1134 (2016). The Special Handling log is an unofficial document maintained by deputies in the special handling unit of the classification division in the Orange County jail prior to 2013. *See id.* at 1117 & n.5.

The Orange County Sheriff's Department produced redacted excerpts of Boeker's TRED records and Special Handling logs in 2017. The records document some of Boeker's informant work starting as early as the mid-1990s. They include reference to Boeker's informant work for Orange County, the city of Anaheim, as well as "outside agencies." One entry states that Boeker was "working with the DA to put Charles Clements . . . aways [sic] for life." The records also reflect coordination between the Orange County Sheriff's Department and the Anaheim Police Department to set Boeker and Clements up on a recorded van ride, and that Boeker was handled at various times by officers implicated in the informant scandal.

Boeker's pre-trial TRED entries also reflect a history of mental health concerns beginning in 2008-2010. The entries say that Boeker "needs psych meds, hears voices," has "mental prob[lem]s," is "not suitable as worker [sic]," and that he was transferred to what the TRED records call "mental housing." The entries reflect mental health concerns about Boeker as late as February 2010—two months before he became an informant in the Clements case. Concerns about Boeker's mental health in these records

appear again after Clements's trial, including a 2012 notation to the effect that Boeker is "basically mental," and "a little crazy."

The Orange County Superior Court issued a reasoned decision denying Clements's petition for habeas corpus. Before beginning its analysis, the court identified the following standards as governing the issue of materiality on Clements's claims.

For Clements's Sixth Amendment claim under *Massiah*, the court said "[w]e need only conclude that it is clear beyond a reasonable doubt that if the jury had not considered the tainted evidence its verdict would have been the same." *In re Clements*, No. M-17351, *12–*13 (Orange Cty. Super. Ct. June 15, 2018). For what it called Clements's "claim of false testimony," the court said the testimony must have been

> of such significance that it may have affected the outcome, in the sense that with reasonable probability it could have affected the outcome. . . . In other words, false evidence passes the indicated threshold if there is a reasonable probability that, had it not been introduced, the result would have been different.

*Id.* at *13 (internal quotation marks omitted).

For the *Brady* claim, the court stated that materiality requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at *14 (quoting *People v. Salazar*, 53 Cal. 4th 1031, 1042–43 (2005)). Finally, for prosecutorial misconduct, the court said that misconduct is

material "if it so infects the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at \*15.

The court accepted *arguendo* that (1) Clements's Sixth Amendment right to counsel was infringed upon when the jailhouse informant was used to elicit information from Clements outside the presence of his lawyer; (2) the prosecution presented testimony from that informant that it knew or should have known was false; (3) the prosecution withheld favorable evidence from the defense; and (4) there was prosecutorial misconduct in the manner Clements alleged. The court's analysis then addressed the materiality of all four claims together.

The court first noted that Boeker was not the prosecution's principal witness, his criminal record and his history as an informant were exposed to the jury, and he was impeached extensively on cross-examination. It stated that the jury's inability to reach a verdict on the charge of solicitation to commit murder indicated that it considered Boeker not to be credible. It also noted that Clements's prior sufficiency of the evidence challenge was considered and rejected on direct appeal even without accounting for Boeker's testimony. "In other words," the court concluded, "the evidence minus Boeker's testimony was sufficient to uphold petitioner's kidnapping for robbery convictions." *Id.* at \*16.

The Superior Court then quoted at length from the appellate court's discussion on direct appeal of the sufficiency of the evidence, because its reasoning was "instructive with respect to the strength of the prosecution's case independent of Boeker's testimony." *Id.*

The Superior Court ultimately held that Clements's "four claims of error are not shown to have materially prejudiced

petitioner's defense in a constitutional sense." *Id.* at *18. It also held—again referring to all four claims together—that any "errors were immaterial and harmless beyond a reasonable doubt," and that "it [was] not reasonably probable the outcome of [Clements's] trial would have been different absent the complained about errors given the evidence presented at trial." *Id.* at *16.

The California Court of Appeal and the California Supreme Court summarily denied Clements's petition for review.

Clements then returned to federal court with an amended habeas corpus petition containing the instant claims.

In considering Clements's *Napue* claim, the district court held that the state Superior Court misapplied Supreme Court law governing materiality in the *Napue* context, and the district court therefore reviewed that claim *de novo*. Specifically, the district court said the state court "considered whether there was a 'reasonable probability' that had the false evidence not been introduced 'the result would have been different' instead of whether 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" Rep. & Recommendation of U.S. Magistrate Judge at 40, *Clements v. Fisher*, No. SA-CV-14-2002, 2022 WL 671548 (C.D. Cal. Mar. 7, 2022) (quoting *Giglio v. United States*, 405 U.S. 150, 153, 154). The district court ultimately denied the *Napue* claim on *de novo* review, however, holding that "there is no reasonable likelihood that Boeker's allegedly false testimony affected the jury's judgment as to the aggravated kidnapping or robbery." *Id.* at 41.

In its review of the remaining claims, the district court noted that the Superior Court "likely misstated the applicable

inquiry" regarding materiality/harmless error. *Id.* at 24. The court nonetheless applied AEDPA deference to the Superior Court's materiality determinations on the *Massiah*, *Brady*, and prosecutorial misconduct allegations, reasoning that the court had not acted unreasonably.

The district court held that relief was not warranted on Clements's *Massiah* claim. It concluded that the *Massiah* violation did not have a substantial and injurious effect or influence on the jury's verdict under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). The district court also rejected Clements's *Brady* and prosecutorial misconduct claims, holding that there was no reasonable likelihood that the jury would have reached a different verdict on the aggravated kidnapping and robbery charges if it had been aware of Boeker's involvement in the jailhouse informant scheme.

## Standard of Review

We review the district court's denial of Clements's habeas petition *de novo* and its findings of fact for clear error. *Lopez v. Thompson*, 202 F.3d 1110, 1116 (9th Cir. 2000) (en banc). Where the state appellate courts have issued summary denials of a claim, federal courts look through those denials to the last reasoned state court decision that addressed the petitioner's claim and presume that subsequent state appellate courts "adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). In this case, we look to the California Superior Court's Order Denying Habeas Relief.

AEDPA applies to this case because Clements filed his habeas petition after April 24, 1996. *See Kipp v. Davis*, 971 F.3d 939, 948 (9th Cir. 2020). Accordingly, we defer to the judgment of the state court when reviewing claims that were adjudicated on the merits, unless the state court's decision

was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

A state court decision is "contrary to" federal law if the court either applies a rule that contradicts governing Supreme Court law or arrives at a different result than the Supreme Court when reviewing a set of "materially indistinguishable" facts. *Cudjo v. Ayers*, 698 F.3d 752, 761 (9th Cir. 2012) (quotation omitted). A state court "unreasonably applies" governing law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts" of the current case. *Id.* (quotation omitted). To find a state court's application of Supreme Court precedent unreasonable, the "decision must have been more than incorrect or erroneous"; it must have been "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000)). Still, "the Supreme Court has made clear, it is the application, not the recitation of a standard that matters for § 2254(d) purposes." *Hardy v. Chappell*, 849 F.3d 803, 819 (9th Cir. 2016) (as amended) (citing *Sears v. Upton*, 561 U.S. 945, 952 (2010) (per curiam)).

When a state court decision on a petitioner's claim was contrary to or an unreasonable application of federal law, we review the claim *de novo*. *Panetti v. Quarterman*, 551 U.S. 930, 953–54 (2007); *Frantz v. Hazey*, 533 F.3d 724, 739 (9th Cir. 2008) (en banc).

**Discussion**

## I.  *Napue* Claim

Both parties, like the district court, agree that Clements's *Napue* claim is subject to *de novo* review because the state court did not apply the governing standard for materiality established by the Supreme Court.  We agree as well. Supreme Court precedent at the time of Clements's conviction clearly established that a *Napue* violation—the knowing presentation of false testimony by the prosecution—is material and requires setting aside a conviction if there is "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury."  *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (quoting *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (en banc)); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976).

As the State expressly concedes, that is not the standard the state court applied.  Rather, the state court improperly applied the state-law harmless error standard.  Specifically, after reciting a standard that arguably did not differ much from the proper standard under *Napue*, the state court expressly translated it into a standard significantly more onerous than the one the Supreme Court has set.  The state court stated that

> [f]alse evidence is substantially material or probative if it is of such significance that it may have affected the outcome, in the sense that with reasonable probability it could have affected the outcome . . . .   In other words, false evidence passes the indicated threshold if there is a reasonable probability that, had it

not been introduced, the result *would have*
been different*.*

*In re Clements*, No. M-17351 at \*13 (emphasis added)
(quoting *In re Cox*, 30 Cal. 4th 974, 1008–09 (2003)).  As
the State acknowledges on appeal, "would have" is not the
same as "could have."   In addition, as we noted when
addressing a similar issue in *Dow v. Virga*, 729 F.3d 1041,
1048 n.6 (9th Cir. 2013), "[t]hat the [Superior Court's]
standard is stricter is also reflected in its use of the term
'reasonably probable' in contrast to *Napue*'s use of the term
'any reasonable likelihood.'"

In short, the state court applied a more onerous standard
that is "contrary to" governing Supreme Court law.  *Dow*,
729 F.3d at 1049.  We therefore consider the *Napue* claim
"without the deference AEDPA otherwise requires."  *Id.*
And as we have noted, the State itself concedes that the state
court applied the wrong materiality standard under *Napue*
and that *de novo* review therefore applies.

In addition, the parties do not dispute the first two
elements of Clement's *Napue* claim—"that (1) the testimony
(or evidence) was actually false, [and] (2) the prosecution
knew or should have known that the testimony was actually
false."  *Hayes* 399 F.3d at 984 (quoting *United States v.
Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)).  Because the
state and district courts assumed without deciding that these
elements were satisfied, we review them *de novo* as well.
*See Weeden v. Johnson*, 854 F.3d 1063, 1071 (9th Cir. 2017)
(collecting cases).

## A.   Falsity and Knowledge

Clements argues that the prosecution violated *Napue* by
permitting Boeker to testify that he received no parole

consideration for his actions and that his motives for coming forward were altruistic, when the prosecutors knew or should have known that this was false. The State does not argue otherwise. And we agree that the prosecution violated *Napue*.

At trial Boeker testified that the parole board initially offered him a one-year sentence for a parole violation, which he declined. When the prosecution asked why Boeker declined that offer and opted instead for a full revocation hearing, Boeker said it was because he "felt [he] wasn't guilty of the charges that they arrested [him] for." The prosecutor prompted Boeker to confirm that, "sometime on April 27th, 2010 or later," *i.e.*, approximately two months after the parole board's initial offer of a one-year sentence, Boeker was offered eight months and he accepted the offer. Boeker agreed this was true. The prosecutor then directly asked Boeker whether he received a benefit for his cooperation against Clements:

> Q. After you gave the information to Detective Meyer and to Detective Reiss, were you given any type of break on your sentence for parole?
>
> A. No, I wasn't.
>
> Q. So they just offered you the eight months and you took the eight months for your parole violation?
>
> A. Right.

Contrary to Boeker's testimony, it is quite clear that he received a benefit from his assistance to law enforcement in Clements's case. And the timing of Boeker's outreach to the

police about Clements's case belies his claims of altruistic motive. As the defense attempted to clarify on cross-examination, Boeker contacted the police about Clements's case on April 17, 2010, four days after being sentenced on a new charge and while his pre-existing parole-violation case remained open. On April 27, Boeker had a parole hearing, in which he was offered and declined a ten-month sentence. On May 11, he had another parole hearing, in which he was offered and accepted an eight-month sentence. As the district court summarized, "within a month of coming forward with information about [Clements,] Boeker received the exact sentence he wanted and which hadn't been available to him earlier [leaving] little doubt that he benefited from his cooperation."

What did not come out at Clements's trial—and what the prosecution in his case knew—is that multiple members of the law enforcement team working on Clements's case were involved in obtaining the exact parole sentence Boeker desired and were in touch with Boeker about their efforts to obtain leniency. This included the lead detective, who contacted Boeker's parole agent on at least two separate occasions and then wrote the parole board, imploring them to "consider a new parole sentence hearing or a review of [Boeker's] current sentence for a possible reduction in time"; Chad Meyer, the informant handler whom Boeker called when his parole hearing passed and his agent was not there to give information about his involvement in the case, and who later informed Boeker that they had contacted the parole board; the district attorney investigator who memorialized the benefit and attempts to communicate Clements's involvement to the parole board in a memo to the prosecutor; and the prosecutor herself once she received the memo.

Given these circumstances, the prosecution knew or should have known Boeker's testimony was untrue and did not fulfill its duty to correct it.  Our precedent is clear:

> [T]he government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony is false. Where the prosecutor knows that his witness has lied, he has a constitutional duty to correct the false impression of the facts.

*United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000); *accord Soto v. Ryan*, 760 F.3d 947, 968 (9th Cir. 2014); *Sivak v. Hardison*, 658 F.3d 898, 909 (9th Cir. 2011); *Dickey v. Davis*, 69 F.4th 624, 639 n.8 (9th Cir. 2023).  Even where a prosecutor is actually "unaware of promises made by the police and sheriff's department" to a witness who testified falsely about receiving a benefit, still "[the prosecutor] 'should know' when a witness testifies falsely about such evidence." *Jackson*, 513 F.3d at 1075.  This is because that prosecutor "has a clear *Brady* obligation to investigate whether the police have evidence favorable to the defendant." *Id.*  There is thus little question that the requirement of knowledge is satisfied here, where the law enforcement team was deeply involved in acquiring the benefit Boeker received, kept him apprised of their progress, and directly informed the prosecutor of their efforts.

## B.   Materiality

On a *Napue* claim, the existence of constitutional error does not alone justify relief; the error must be material. *Hayes*, 399 F.3d at 984.  But the standard for materiality under *Napue* is "considerably less demanding" than other

materiality standards on constitutional claims arising from criminal cases. *Dickey*, 69 F.4th at 637. In *Brady* cases, for example, we ask if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding *would have* been different." *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)). The *Napue* inquiry requires only that there be "*any reasonable likelihood* that the false testimony *could have* affected the judgment of the jury." *Id.* at 636 (quoting *Agurs*, 427 U.S. at 103–04); *accord Hayes*, 399 F.3d at 985.

Where, as in this case, the petitioner alleges both *Napue* and *Brady* violations, we first consider the *Napue* violations collectively under *Napue*'s more lenient standard. *Jackson*, 513 F.3d at 1076. If that standard is met, habeas relief must be granted. "[I]f the *Napue* errors are not material standing alone, we consider all of the *Napue* and *Brady* violations collectively" under *Brady*'s materiality standard. *Id.*

In a consistent throughline of cases predating even *Napue* itself, the Supreme Court has made clear that claims that the prosecution knowingly used false evidence to obtain a conviction are subject to a more lenient materiality standard "not just because [*Napue* cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *Dickey*, 69 F.4th at 637 (quoting *Agurs*, 427 U.S. at 104); *see also Agurs*, 427 U.S. at 103 nn.8–9 (collecting cases). And as applied here, the Supreme Court's prohibition on the use of false evidence, and its rationale for the different standard, "do[] not cease to apply merely because the false testimony goes only to the credibility of the witness." *Napue*, 360 U.S. at 269.

Clements argues that, as in *Napue*, Boeker's false testimony about not receiving a benefit and his altruistic motive so undermines Boeker's credibility that if the jury knew the truth, it might have concluded that Boeker fabricated *all* his testimony. *See Napue*, 360 U.S. at 270 ("Had the jury been apprised of the true facts, however, it might well have concluded that [the witness] had fabricated [his] testimony . . . ."). Clements contends that the *Napue* violation entitles him to relief on the aggravated kidnapping conviction[1] because Boeker's testimony was highly probative of Clements's consciousness of guilt and identity on the aggravated kidnapping counts, it was relevant regarding the criminal implications of his alleged aggravated kidnapping, and it went directly to the essential element of whether he created a substantial increase in risk to the victims. We agree.

The State's argument that Boeker's testimony could not have affected the jury's decision on the aggravated kidnapping charge does not hold water. First of all, in opposing Clements's request to sever the solicitation for murder charge from the aggravated kidnapping charge, the prosecution argued that Boeker's testimony had a direct bearing on Clements's consciousness of guilt, as well as the issues of his identity as the kidnapper and motive. The state trial judge accepted this contention, as did the state appellate court on direct appeal. All did so for good reason: Boeker's testimony was indeed relevant and material regarding the aggravated kidnapping charges, not just on the solicitation for murder charge.

---

[1] In his opening and reply briefs, Clements limits his argument regarding the *Napue* violation to the aggravated kidnapping charges.

Among other things, Boeker testified at trial that Clements "talked to [him] about how he performed the robbery," and about "how he persuaded the bank manager to rob his own bank—her own bank—and how she persuaded the bank vault manager to become involved in it." Boeker testified at length that Clements first wanted evidence "planted at [Lopez's] house to make her [appear to be] involved in the robbery so there would be no kidnapping charges." And he testified that Clements drew him a map of Lopez's house that included a description of her car. Boeker's testimony also was the only evidence of an admission of guilt by Clements himself, which was significant in view of the prosecution's acknowledgment prior to trial that "neither of the victims who are kidnapped can identify the defendant" or "pick him out of a photo lineup," and the victims' actual inability to identify Clements at trial. This testimony was plainly material to Clements's convictions for aggravated kidnapping.

Boeker's testimony also addressed the issue of whether Clements created a substantial risk to the victims during the kidnapping—an essential element of the aggravated kidnapping charges. Boeker provided a singular description of Clements's capacity for violence in describing the ways he had said he wanted to kill Lopez. Boeker testified that Clements asked him how he felt about "taking [Lopez] out to the desert as far as you can drive her and drop[ping] her off" to die. He testified that Clements "went from just killing [Lopez]" to "want[ing] the whole family killed," and he quoted Clements as saying, "I want the little baby killed, too." According to Boeker, Clements came up with two other ways to kill Lopez or her family. One was by rigging the garage door opener so that when "they hit the garage door opener, the furnace would ignite the gas, the gas connection

to the furnace, and the house would explode." The other was by planting narcotics in Lopez's car "and putting a bullet in the back of her head [so] the cops would think, 'oh, it's just a dope deal gone bad.'" All of this supported the prosecution's contention that Clements was a violent person, and it therefore had a direct bearing on the question of whether he had created a substantial risk to the kidnapping victims.

The prosecution's effort to bolster Boeker's testimony in closing argument further highlights its importance beyond just the murder solicitation charge. The prosecution reiterated Detective Meyer's testimony that Boeker would just "give [him] information for no reason" and said the defense "ridiculed" Boeker on cross-exam by questioning his motives. The prosecution acknowledged that Boeker had "issues" but emphasized that he was "the kind of man who sometimes, when he sees something is very, very wrong . . . will call and he doesn't have an ulterior motive." And it implored the jury to "[c]onsider that when you go back and you're talking about Boeker and his testimony."

The State's argument that Boeker was impeached in other respects and that there was other evidence of Clements's guilt does not adequately engage the inquiry *Napue* requires. As in *Napue*, "the fact that the jury was apprised of other grounds for believing that the witness [] may have had an interest in testifying against petitioner" does not turn "what was otherwise a tainted trial into a fair one." *Napue*, 360 U.S. at 270. And even if it may be the case, as the State argues, that the jury did not convict Clements of aggravated kidnapping *just* because it heard Boeker's testimony, that is not our inquiry. The standard for prejudice under *Napue* does not require a finding that the

conviction was "just because," or even primarily because, of the false testimony.

Further, the proposition that other evidence was sufficient to establish Boeker's guilt on aggravated kidnapping does not carry the day under *Napue*. Indeed, even with a *Brady* violation—where the standard for materiality is higher than under *Napue*—materiality "is not a sufficiency of the evidence test" under which a court sets aside the tainted evidence and assesses the sufficiency of what is left. *See Kyles v. Whitley*, 514 U.S. 419, 435 n.8 (1995). Rather, for a *Napue* claim, the inquiry is focused on the potential impact of the false testimony. The false testimony is material if there is *any* reasonable likelihood that it *could* have affected the jury. *See Jackson*, 513 F.3d at 1076. For the reasons discussed, Clements has established such a reasonable likelihood here.

Indeed, the record reflects that Boeker's testimony *actually did* affect the judgment of the jury. During the trial, a juror raised their hand to ask about prior statements Boeker had made in an interview with a detective. And during deliberations, the jury requested readbacks of Boeker's testimony twice. Although the jury deadlocked on the solicitation charge, at least six jurors found Boeker credible and believed his testimony—the *only* source of evidence supporting that charge—beyond a reasonable doubt. This strongly indicates that his testimony played a role in at least those jurors' assessment of the aggravated kidnapping charges.

Our dissenting colleague says we are "watering down" the *Napue* materiality standard, turning it into nothing more than a "relevance" standard, but this is based on a misreading of our precedent. According to the dissent, we may grant

habeas based on a *Napue* violation "only when the false testimony was 'the centerpiece of the State's case' and when the prosecutor 'exploit[ed]' the false testimony by 'imploring the jury' to believe the witness and admitted that such testimony 'comprised nearly the entirety of the State's evidence.'" Dissent at 36 (quoting *Dickey*, 69 F.4th at 644–45). That may have been the case in *Dickey* itself, but neither *Dickey* nor any other case in this Circuit or from the Supreme Court states that we grant habeas *only* when those circumstances exist. Nor is there any case that says we grant habeas *only* when there is "no room to doubt" the reasonable likelihood that the testimony could affect the jury's decision, as our dissenting colleague contends. The latter is contradicted by the *Napue* standard itself, which directs the Court to grant habeas when there is "*any* reasonable likelihood" the violation could have affected the determination of the jury. *See Jackson*, 513 F.3d at 1076. The fact that the circumstances present in *Dickey* cleared the *Napue* materiality standard by a large margin does not turn those circumstances into the bar that all other cases must clear.

Contrary to our dissenting colleague's contention, our decision neither suggests nor requires the conclusion that the jury could have "rested its verdict on Boeker's disputed testimony," or that the jury "only determined that Clements was 'dangerous' based on" that testimony. Dissent at 45. We have been clear, and we conclude, only that there is a "*reasonable likelihood* that the false testimony *could have* affected the judgment of the jury." *Dickey*, 69 F.4th at 636 (quoting *Agurs*, 427 U.S. at 103–04).

In sum, it is undisputed that Boeker testified falsely about receiving no leniency for his cooperation and about his motives for cooperating. The prosecution knew that

testimony was false but did nothing to correct it. Boeker's testimony bore directly on Clements's guilt on the kidnapping charge, not simply on the solicitation charge. And the trial record demonstrates that members of the jury found Boeker to be credible and were willing to rely on his testimony to sustain a conviction. We therefore conclude that Boeker's false testimony, the prosecution's failure to correct it, and the resulting impact on Clements's ability to impeach his credibility could have affected the jury's judgment on the aggravated kidnapping charges. Indeed, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue*, 360 U.S. at 269.

Clements has met his burden of establishing that there is "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Jackson*, 513 F.3d at 1076 (quoting *Hayes*, 399 F.3d at 985). We therefore reverse the district court's denial of habeas corpus with regard to the aggravated kidnapping charges.

## II. *Brady* Claim

Clements's *Brady* claim, like his *Napue* claim, is directed only to his convictions on the aggravated kidnapping charges. Because our decision on the *Napue* claim is dispositive, we need not and do not address the merits of Clements's *Brady* claim. This includes his alternative request to remand the *Brady* claim for an evidentiary hearing. Because Clements obtains via the *Napue* claim the relief he seeks via his habeas corpus petition—vacating the aggravated kidnapping charges—we

need not address the request for an evidentiary hearing on the *Brady* claim.

## III.   Prosecutorial Misconduct and *Massiah* Claims

Clements's final claims are that Boeker's testimony should have been excluded in its entirety because the prosecution violated *Massiah*, and a claim that the prosecution's misconduct considered as a whole made the trial fundamentally unfair. Specifically, Clements contends that the prosecution violated *Massiah* by deliberately using Boeker to elicit incriminating statements from him after his Sixth Amendment right to counsel had attached. Clements also contends that the prosecution's conduct deprived him of a fair trial in view of the "coordinated effort between the prosecution and police to obtain incriminating statements in violation of *Massiah*," the withholding of *Brady* material relevant to those incriminating statements and the informant who claimed to have heard them, and permitting Boeker to testify falsely, in violation of *Napue*. Clements contends that even if the prejudice from the misconduct associated with each of these actions does not justify relief individually, they do collectively. Although we have overturned the district court's denial of Clements's *Napue* claim, we address the remaining claims to ensure a complete record.

As with the *Napue* and *Brady* claims, Clements contends that the district court erred in granting AEDPA deference to the state court's resolution of his prosecutorial misconduct and *Massiah* claims. We disagree. The district court's grant of deference to the state court determination of these claims was appropriate.

The state court identified the correct governing law for both claims. In addressing the prosecutorial misconduct claim, the state court noted that the conduct rises to the level

of constitutional violation "if it so infects the trial with unfairness as to make the resulting conviction a denial of due process." *In re Clements*, No. M-17351 at *15; *see Bagley*, 473 U.S. at 682. For the *Massiah* claim, the court stated that it "need only conclude that it is clear beyond a reasonable doubt that if the jury had not considered the tainted evidence its verdict would have been the same." *In re Clements*, No. M-17351 at *12 (quotation omitted); *see Davis v. Ayala*, 576 U.S. 257, 267 (2015) ("On direct appeal, the harmlessness standard is the one prescribed in *Chapman*: '[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.'" (citation omitted)).

For both claims, the state court assessed the quantum of aggravated kidnapping evidence introduced by the prosecution without the testimony acquired through the assumed *Massiah* and prosecutorial misconduct violations. It concluded that the outcome would have been the same "given the evidence presented at trial" and the introduction of other witnesses, and it referred to the state appellate court's reasoning on direct appeal "with respect to the strength of the prosecution's case independent of Boeker's testimony." The court held that "the evidence minus Boeker's testimony was sufficient to uphold petitioner's [aggravated kidnapping] convictions" and that for this reason, "the complained about errors were immaterial and harmless beyond a reasonable doubt," in accord with *Chapman v. California*, 386 U.S. 18, 24 (1967).

The difference between the materiality standard applied to this claim and the standard applicable to Clements's *Napue* claim is significant. Although the existence of other evidence sufficient to sustain the verdict neither reflects nor satisfies the Supreme Court's inquiry under *Napue*, the

opposite is true for prosecutorial misconduct claims and other claims subject to *Chapman*'s harmless error standard. *See Darden v. Wainwright*, 477 U.S. 168, 182, *reh'g denied*, 478 U.S. 1036 (1986); *Schneble v. Florida*, 405 U.S. 427, 430 (1972). As a result, the state court's analysis—even if arguably imprecise, particularly as to the prosecutorial misconduct claim—was based on an application of the appropriate governing law. We accordingly review these claims with the deference AEDPA generally requires, unlike Clements's *Napue* claim, which we reviewed *de novo*.

When reviewing claims subject to AEDPA deference, relief may be granted only if the state court's determination was objectively unreasonable. *Davis*, 576 U.S. at 268–69. To assess whether a finding is objectively unreasonable we first "conduct an independent review of the record to determine what arguments or theories could have supported the state court's decision." *Bemore v. Chappell*, 788 F.3d 1151, 1161 (9th Cir. 2015) (alterations incorporated) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). We then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a decision of the Supreme Court." *Id.* (alterations incorporated) (quoting *Richter*, 562 U.S. at 102). "'[S]o long as fairminded jurists could disagree on the correctness of the state court's decision,' AEDPA precludes federal habeas relief." *Kipp*, 971 F.3d at 949 (quoting *Richter*, 562 U.S. at101).

Given this deferential standard, there is no basis for overturning the state court's denial of the *Massiah* and prosecutorial misconduct claims. A reasonable jurist could determine after setting aside Boeker's testimony that the other evidence, including the testimony of Lopez and Chin, as well as weapons recovered from Clements's home that

resembled those used during the crime, $36,000 in hundred-dollar bills in his storage locker, and DNA evidence from Lopez's home, was sufficient to establish his guilt on all of the charges on which he was convicted.

For these reasons, we affirm the district court's denial of Clements's *Massiah* and prosecutorial misconduct claims.

## CONCLUSION

We reverse the district court's denial of Clements's claim under *Napue* and remand the case to the district court with instructions to grant Clements's petition for a writ of habeas corpus with respect to the charges of aggravated kidnapping.

**REVERSED and REMANDED.**

---

BUMATAY, Circuit Judge, dissenting:

Charles Clements, feigning a delivery, followed Alison Lopez into her home. Lopez was seven-and-a-half months pregnant at the time. Once inside the home, Clements pulled out a gun. He then gave Lopez a false choice—either she help him rob the bank she worked for, or he would kill her and her unborn child right there and then. Showing he was serious, Clements took out a second gun and placed what looked like a silencer on it. That wasn't all—he claimed that a dangerous gang was watching the bank's employees and their families and that it would kill them all if she didn't comply. Lopez followed Clements's demands.

Clements then directed Lopez into her car and drove them to the bank. While at the bank, Clements forced Lopez to lure Cindy Chin, Lopez's friend and co-worker at the

bank, into the parking lot.  Clements took Chin hostage at gunpoint and told Lopez to enter the bank and fill a duffel bag with money.  Once again, Clements threatened Lopez's and her family's lives.  Lopez did what Clements ordered.  After Lopez returned with the stolen money, Clements drove off with both Lopez and Chin.  After driving some distance, Clements finally released them.  In the end, there was no gang—Clements orchestrated every step of this robbery and kidnapping.

None of these facts are disputed.  At trial, Clements even conceded that he committed the robbery and kidnapped Lopez and Chin.  The California jury then convicted Clements of two counts of aggravated kidnapping and three counts of robbery.  *See* Cal. Penal Code §§ 209(b), 211, 212.5(c).  And those verdicts were upheld on direct appeal.  Normally, that would be the end of the story.  But here, it's just the beginning.

That's because a jailhouse informant also testified at trial.  Donald Boeker did not come into the picture until more than a year after Clements's crime.  Boeker was housed in the same jail cellblock as Clements.  Boeker claims he struck up a friendship with Clements.  According to Boeker, Clements eventually asked for help with his robbery and kidnapping case.  At first, Clements reportedly asked Boeker to make it look like Lopez was complicit in the robbery.  So Clements, Boeker says, hatched a plan for Boeker to plant money wrappers in Lopez's backyard, house, and car to further the appearance that she was part of the robbery.  Later, the plan evolved into something more sinister, Boeker alleges.  Boeker claims that Clements asked him to kill Lopez, her husband, and their baby to make the case go away.  These facts are more disputed.

What we know for certain is that Boeker informed his police contacts of this alleged plot, and the State brought another charge against Clements—solicitation of murder. *See* Cal. Pen. Code § 653f(b). At trial, it was revealed that Boeker was not the most reliable witness and that he worked as a police informant for many years. It was also revealed that Boeker sought to benefit from his cooperation by seeking a reduced sentence on his parole revocation. The jury did not reach a verdict on the solicitation charge with six jurors voting to acquit Clements. The charge was later dismissed.

Clements petitioned for habeas corpus relief claiming that his due process rights were violated by Boeker's testimony and that he is entitled to vacatur of his aggravated kidnapping convictions. Multiple levels of federal and state courts denied Clements's petition. He first filed his habeas petition in California's state courts. Even assuming Clements's constitutional rights were violated, a California superior court denied Clements's petition because the "errors were immaterial and harmless beyond a reasonable doubt" and "it [was] not reasonably probable the outcome of [Clements's] trial would have been different absent the complained about errors given the evidence presented at trial." Both the California Court of Appeal and the California Supreme Court affirmed the denial of Clements's petition. Clements then filed a federal habeas corpus petition. A federal magistrate judge recommended that Clements's federal petition be denied. A federal district judge agreed and denied the petition.

Despite this history, the majority grants Clements's habeas petition under *Napue v. Illinois*, 360 U.S. 264 (1959), and sets aside his aggravated kidnapping convictions. In doing so, the majority waters down the materiality standard

for *Napue*.    Contrary to our precedent, the majority seemingly equates materiality with anything that "support[s]" an element of the charged offenses.  Indeed, the majority lowers the materiality bar *so low* that it grants this habeas petition on grounds that Clements *conceded* at trial. Besides that, the majority engages in rank speculation to elevate the importance of Boeker's testimony.  By botching the materiality standard, we create confusion within our circuit on the proper *Napue* standards, which does a disservice to both criminal defendants and governments in the Ninth Circuit.

Because our circuit once again chooses to "depart[] from [our] well-established rules," *see Thornell v. Jones,* 602 U.S. —, 144 S. Ct. 1302, 1307 (2024), I respectfully dissent.

## I.

### *Napue*

A *Napue* violation occurs "when a prosecutor either knowingly presents false evidence or fails to correct the record to reflect the true facts when unsolicited false evidence is introduced at trial."  *Reis-Campos v. Biter*, 832 F.3d 968, 976 (9th Cir. 2016) (simplified).  To prevail here, Clements bore the burden of showing: "(1) testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material."  *Dickey v. Davis*, 69 F.4th 624, 636 (9th Cir. 2023) (simplified).    Despite AEDPA, all parties agree that we review this claim de novo. *See Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010) (applying de novo review when a state court denial of a habeas petition was contrary to clearly established federal law).

For this claim, Clements asserts that Boeker lied when he claimed he came forward with his testimony against Clements because it was "the right thing to do," out of his concerns for Lopez and her family's safety, and not because he was seeking a lower sentence for his pending parole violation. Clements asserts that prosecutors violated his due process rights by not correcting this testimony, especially given that prosecutors knew or should have known police officers contacted Boeker's parole board on his behalf based on his cooperation.

Clements's *Napue* claim does not warrant habeas relief. Even assuming the first two *Napue* factors are met, which isn't a given, the claim easily fails on the third element—materiality.

## A.

### Materiality

To show "materiality," we look at the alleged false testimony "collectively" and ask if the petitioner has shown "a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019) (simplified). While *Napue* materiality is less demanding than *Brady* materiality, *see Reis-Campos*, 832 F.3d at 976, it is no slouch. "[A] *Napue* claim fails if, absent the false testimony or evidence, the petitioner still received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Panah*, 935 F.3d at 664 (simplified).

So the materiality inquiry turns on our overall confidence in the verdict, not on creative conjecture, which is what we see here. When "we have full confidence that the jury would still have convicted," the petitioner has failed to prove

materiality. *Sivak v. Hardison*, 658 F.3d 898, 913 (9th Cir. 2011). And our cases demonstrate that we take the petitioner's burden to show materiality seriously. We're supposed to grant habeas only when the false testimony was "the centerpiece of the State's case" and when the prosecutor "exploit[ed]" the false testimony by "imploring the jury" to believe the witness and admitted that such testimony "comprised nearly the entirety of the State's evidence." *Dickey*, 69 F.4th at 644–45. On the other hand, when the "State presented a powerful case of [the petitioner's] guilt, with substantial evidence linking him" to the offense and the false testimony was "just one – and not a crucial – piece of that presentation," *Panah*, 935 F.3d at 664, we can safely find no materiality. Put simply, when a petitioner establishes only a single witness's misleading testimony in the face of "devastating and largely unchallenged" evidence, there is no *Napue* violation. *Id.* at 667. So we only find materiality when there's "no room to doubt" the reasonable likelihood that the testimony could affect the jury's decision. *Dickey*, 59 F.4th at 644.

Here, setting aside whether Boeker's somewhat subjective statements are false, there's no reasonable likelihood that Boeker's testimony could have affected the jury's verdict for two reasons. First, given the overwhelming evidence presented at trial, Boeker's misstatements could not have impacted the jury's aggravated kidnapping verdicts. Second, most of the information contradicting Boeker's testimony already came out at trial. So pointing out Boeker's lies largely would have been cumulative.

**1.**

## Overwhelming Evidence of Clements's Guilt

Assuming Boeker gave false testimony, it could not be material given that the evidence against Clements was "overwhelming," "devastating," and "largely unchallenged." *See Panah*, 935 F.3d at 667. Sixteen witnesses testified for the prosecution, including Lopez and Chin. Given the state of evidence, Clements's counsel conceded most of the issues at trial.

Take the robbery charges. So powerful was the evidence that Clements conceded he committed the robbery at trial. As Clements's counsel admitted at closing, "I want to start out by saying Mr. Clements is guilty of robbery. Mr. Clements is guilty of robbery. We don't dispute that. We haven't disputed that during the entire trial." So there's no question that Boeker's testimony was not material to the robbery convictions—the jury could not have found differently when Clements admitted to the robbery convictions. Even the majority begrudgingly agrees that Clements's robbery convictions should be left untouched.

And the evidence was just as strong on the aggravated kidnapping charges—so much so that Clements admitted he kidnapped the victims and only challenged the asportation element. Under California law, aggravated kidnapping requires asportation—"the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in" robbery. Cal. Pen. Code § 209(b)(2); *see People v. Dominguez*, 39 Cal. 4th 1141, 1152 (2006) ("The essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement.").

Again, look to Clements's closing. Clements's counsel admitted nearly every element:

> Taking them hostage – and it's true, they were held against their will. I don't dispute that in any way. . . . Ms. Lopez at her home was already being held. That's the first element. Person was moved against will or held by force. That's what's required. Ms. Chin was already being held in the vehicle before there was any movement. . . . Ms. Chin's fear? No question, her fear was real, her fear was legitimate and it was caused by the actions of Mr. Clements.

The only question Clements's counsel left for the jury was whether the State proved the asportation element. To determine whether a movement increased the risk of harm, courts consider "whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes." *Dominguez*, 39 Cal. 4th at 1152. The evidence of asportation was also overwhelming.

To start, both Lopez and Chin testified to being kidnapped, held hostage, and transported to or from the bank. Lopez was kidnapped from her home and driven to the bank while Clements brandished a gun fitted with a silencer at her. And Chin's testimony of her being held at gunpoint in the car was so traumatic that she broke down crying several times. California law holds that asportation is "clearly brought into being, when . . . the victim is forced to travel a substantial distance under the threat of imminent

injury by a deadly weapon." *People v. Lara*, 12 Cal. 3d 903, 908 (1974).

Second, Clements forcing Lopez into a car to get to the bank is itself asportation. *In re Earley*, 14 Cal. 3d 122, 132 (1975) (increased risk of harm might occur from "an auto accident" or from the victim "attempt[ing] to escape from the moving car or be pushed therefrom"). Driving Lopez and Chin after the robbery is another basis to satisfy this element.

Third, aside from the obvious increased risk of physical harm to Lopez, there was the substantial risk to her unborn child. Recall Lopez was seven-and-a-half months pregnant. The risk to her unborn child was especially high given the shocking experiences Lopez was going through. *See People v. Curry*, 158 Cal. App. 4th 766, 781 (2007) (raising concerns for risk to victim's "unborn child").

Fourth, the threats to Lopez, Chin, and their loved ones heightened the risk of psychological harm and mental suffering to both victims. *See People v. Nguyen*, 22 Cal. 4th 872, 886 (2000) ("[S]ubstantial movement of a victim, by force or fear, which poses a substantial increase in the risk of psychological trauma to the victim beyond that to be expected from a stationary robbery, seems an entirely legitimate basis for [aggravated kidnapping]."). Together with the trauma of facing death themselves, Lopez and Chin believed that dangerous gang members were monitoring their families and could harm their families at any moment. Such serious threats exerted "psychological control" over the two victims that "magnified [Clements's] psychological dominance over [them]." *See People v. Robertson*, 208 Cal. App. 4th 965, 986 (2012).

Fifth, Clements continued to hold Lopez and Chin hostage *after* the robbery. This was not incidental to the robbery and increased the likelihood of them suffering harm. *See People v. Smith*, 18 Cal. App. 4th 1192, 1196 (1992) (finding that forcing victim to "accompany [defendant] on a two-to-three block drive" to complete robbery was not incidental to the crime); *People v. Daniels*, 202 Cal. App. 3d 671, 683 (1988) (three-or-four block drive was movement for "substantial distance" and satisfied the asportation element).

Sixth, that Clements did not release Lopez and Chin at the bank increased the risk that he would keep them as hostages to facilitate his getaway and might later kill them to eliminate witnesses. *Cf. Lara*, 12 Cal. 3d at 907–08 (asportation found when defendants drove victim to remote location and killed him to prevent him from later identifying them). Though this fear did not materialize does not lessen Clements's culpability for increasing the overall risk of harm to Lopez and Chin. *See People v. Rayford*, 9 Cal. 4th 1, 14 (1994).

Finally, Clements's actions in holding Lopez and Chin aided in his escape. It prevented Lopez and Chin from immediately seeking help or otherwise alerting law enforcement to his crimes. *See Dominguez*, 39 Cal. 4th at 1152 (looking at "whether the movement decreases the likelihood of detection").

In sum, it is inescapable that Lopez's and Chin's testimonies alone were devastating, overwhelming, and proof beyond a reasonable doubt of Clements's guilt on the aggravated kidnapping charges, especially the asportation element. Even if Boeker's testimony were completely fabricated, it could not take away from the powerful

testimony of these two victims.  Thus, the Boeker testimony was immaterial to Clements's convictions.

## 2.

## Boeker's Impeachment at Trial

Contrast the strength of Lopez's and Chin's testimonies with the weakness of Boeker's testimony here.  Clements claims that learning the truth of Boeker's parole benefits could have led the jury to conclude that he fabricated all his testimony, and thus the jury could have acquitted Clements on the aggravated kidnapping charges.  Given the weight of unsavory information that came out against Boeker during trial, however, this scenario simply isn't plausible.

To begin, Boeker's credibility was thoroughly challenged at trial and much of the contradictory information Clements now attacks came out during trial.  Boeker testified that he reported Clements's solicitation to kill Lopez and her family because it "was the right thing to do" and he didn't want them killed.  But at trial, Clements's counsel extensively questioned Boeker's reasons for his cooperation.  Take Boeker's own testimony.  On cross-examination, he admitted that he wanted help from officers with his pending parole violation.  He told them, "if you could help me," or "if you want to write a letter" to the parole board, "that would be cool."  He then conceded that he rejected the parole board's first offer of 12 months.  But after his cooperation against Clements, he received an offer for eight-months revocation.  He also confessed that he received payments for his informant work.  When pressed by Clements's counsel, Boeker agreed he did informant work out of self-interest, to either get paid or to "get [him]self out of going to jail[.]" Detective Chad Meyer, whom Boeker reported to as an informant, then confirmed that he had paid Boeker before

and helped Boeker with his criminal cases in exchange for his work as a confidential informant.

To top it all off, the State and Clements read a stipulation to the jury that said that Boeker and police "discussed his pending parole revocation hearing," and that Boeker asked officers "if you guys could help me with maybe, you know, Don[ Boeker is] a good guy, let him go, you know, that's cool." This means that the jury heard that Boeker directly requested help with his parole proceedings and that Boeker directly tied it to his cooperation against Clements. As a stipulation, this evidence was even more damning because the jury would understand that the State was not standing behind Boeker's professed lack of self-interest.

All this undercuts Clements's view that it was material for the jury to not hear about Clements's less-than-altruistic reasons for his informant work. In fact, Clements's counsel extensively fleshed out Boeker's false motives at closing:

> Did he have a motive to lie? His parole decision is pending. We know he didn't want to go to prison. We know he didn't want to do more time. It's right as he settles his case in the local courts. He knows exactly what his sentence is going to be in the local courts. Now the parole situation is the fire that's burning for Mr. Boeker. It's right then that he's calling law enforcement and saying, "something's going on," that he's meeting with law enforcement and saying, "something's going on."

And Boeker's purported dishonesty was also on full display at trial. The jury learned of Boeker's significant

criminal record. In particular, the jury heard that Boeker gave police officers a fake name during a traffic stop and "lied under oath" to a judge. Boeker even admitted he exaggerated and lied about parts of his interactions with Clements. Boeker falsely reported to police that Clements sought to have Chin killed and completely invented a story about Clements contacting a hitwoman to help kill Lopez. Boeker also acknowledged that he was the one who first suggested "eliminat[ing]" Lopez to silence her testimony. All this undermines Boeker's suggestion that he just wanted to make sure Lopez was safe. So, no one—not the police officers, the prosecutors, or the jury—was fooled into believing that Boeker was a simple, honest Good Samaritan acting regardless of his self-interest.

Indeed, the jury didn't believe Boeker either. They failed to reach a verdict on the solicitation charge—the only one that relied on Boeker's testimony. As the state court reasoned, "the fact the jury was unable to reach a verdict on the solicitation to commit murder charge indicates Boeker was not deemed a credible witness."

So even if prosecutors called out Clements's lies during the trial, it would have been merely cumulative of the other evidence presented. Everyone already knew he had credibility issues. Clements thus failed to show any reasonable likelihood that Boeker's false statements—concerning his motive to testify and benefits from law enforcement—could have affected the judgment of the jury. Even though the State could have done better here, there's no basis to say that Clements didn't receive a fair trial or that the verdicts are not worthy of confidence.

**3.**

**The Majority's Errors**

Contrary to the obvious conclusion that Boeker's testimony could not have affected Clements's convictions, the majority treats it as material because (1) it was highly probative of Clements's consciousness of guilt and identity on the aggravated kidnapping; and (2) it was relevant to the "essential element of whether he created a substantial increase in risk to the victims." Maj. Op. 22. But the majority's ruling ignores Clements's concessions at trial and waters down the standard of materiality.

First, Boeker's testimony was completely irrelevant to Clements's consciousness of guilt and identity given his admissions at trial. The majority ignores that Clements *conceded* at trial that he committed the robbery and that he kidnapped Lopez and Chin. Recall, at closing argument, his counsel admitted, "Mr. Clements is guilty of robbery. We don't dispute that." Clements's counsel went only to concede that Clements also held both Lopez and Chin hostage. And the majority misstates the record by claiming that Boeker's testimony was "the only evidence of an admission of guilt by Clements." Maj. Op. 23. Simply, identity and consciousness of guilt were not at issue at trial.

So even though everyone—the State, Clements, the jury—knew Clements committed the kidnapping, the majority pretends that identity was at play so it may deem Boeker's testimony material. But when Clements's own counsel says that Clements did these things, how could Boeker's testimony have affected the jury's decisionmaking? As my colleague once observed, "How can this be? 'I feel like I am taking crazy pills.'" *United States v. Begay*, 934 F.3d 1033, 1042 (9th Cir. 2019) (Smith,

N.R., J., dissenting).  Unfortunately, I may have ingested the same pills.  Rather than acknowledging Clements's concessions, the majority simply lowers the materiality standard so it's nearly indistinguishable from the standard of relevance.  But it's wrong to conflate materiality with relevance.

Second, Boeker's testimony was simply irrelevant for asportation.  The jury heard from Lopez and Chin that Clements cornered a seven-and-a-half month pregnant woman at gunpoint in her home; repeatedly threatened to kill her, including by screwing a silencer onto the barrel of his gun and telling her he could kill her "very quietly"; forced her to rob the bank for him; took a second person hostage to complete the crime; and didn't release his victims even after he had the money in hand, instead driving off with them and fabricating a story that he was taking them to meet a gang that had been monitoring them and their families.

This was overwhelming and devastating evidence of asportation.  To skate around this, the majority nevertheless invents a hypothetical world where the jury could have decided that Lopez's and Chin's testimonies were not enough to decide asportation and then rested its verdict on Boeker's disputed testimony.  Huh?  More crazy pills, I think.  The majority theorizes that the jury could have disregarded the victims' terrifying experiences and only determined that Clements was "dangerous" based on Boeker's testimony that Clements *again* threatened to kill Lopez more than a year after the kidnapping and despite Boeker being a proven liar and the jury not buying his story on the solicitation charge.  Just trying to spin this story of speculation is dizzying.

Once again, the majority brushes past this problem of rank speculation by watering down the materiality standard. This time, it simply finds materiality because the testimony "supported" that Clements was a "violent person." Maj. Op. 24. But whether evidence somehow "supported" an element of the charged offenses is not even remotely close to the *Napue* materiality standard. So the majority uses speculation and watered-down standards to overturn Clements's aggravated kidnapping convictions.

## B.

### Harmless Error

Ordinarily, this subsection would be devoted to analyzing whether, even if Clements had proven a *Napue* violation under AEDPA review, the error was nevertheless harmless. In the normal course, before we can grant habeas relief on a claim of trial error, we must first assess the trial error's prejudicial effect under *Brecht v. Abrahamson*, which requires a "substantial and injurious effect or influence" on the verdict. 507 U.S. 619, 637 (1993). Not so for *Napue* claims. Instead, this subsection will be short given an odd feature of Ninth Circuit law.

We are one of only two circuits that refuse to analyze *Napue* violations under *Brecht*'s harmless-error standard on habeas review. *See Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 150 (3d Cir. 2017); *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc). All other circuit courts to reach this issue go the other way and hold that *Brecht*'s harmless-error doctrine still applies for *Napue*-based claims. *See, e.g.*, *Gilday v. Callahan*, 59 F.3d 257, 268 (1st Cir. 1995); *Douglas v. Workman*, 560 F.3d 1156, 1173 n.12 (10th Cir. 2009) (per curiam); *Rosencrantz v. Lafler*, 568 F.3d 577, 587–90 (6th Cir. 2009); *Trepal v. Sec'y, Fla. Dep't of Corr.,*

684 F.3d 1088, 1111–13 (11th Cir. 2012); *United States v. Clay*, 720 F.3d 1021, 1026–27 (8th Cir. 2013).

And there's good reason to think that we are wrong on this. In *Brecht*, the Supreme Court delineated two categories of constitutional violations reviewed under habeas: "trial error" and "structural defect." 507 U.S. at 629 (simplified). Trial errors occur "during the presentation of the case to the jury." *Id.* (simplified). Such errors are "amenable to harmless-error analysis because [they] may be quantitatively assessed in the context of other evidence to determine [their] effect on the trial." *Id.* at 621 (simplified). In contrast, "structural defects," such as the deprivation of the right to counsel, result in "the automatic reversal of the conviction because they infect the entire trial process" and thus forgo the harmless-error analysis. *Id.* at 629–30.

*Napue* violations fall in the "trial error" category. Our court has definitively said *Napue* violations do not require "*per se* rule of reversal" and are "not structural." *Hayes*, 399 F.3d at 984. Indeed, the admission of perjured or misleading testimony does not infect the *entire* trial process. As a trial error, *Napue* violations should be subject to harmless-error analysis on habeas review.

Still, our circuit disregards *Brecht*. Almost 20 years ago, we sidestepped *Brecht* for *Napue* claims. "When the Supreme Court has declared a materiality standard, [like that in *Napue*,]" we reasoned, "there is no need to conduct a separate harmless error analysis." *Id*. We ruled that "once we have determined whether the *Napue* error was material[,] . . . we do not conduct a separate *Brecht* examination" because the "materiality analysis is complete in itself; there is no need for a separate harmless error review." *Id*. at 985. In other words, because *Napue*

materiality has a more generous standard ("any reasonable likelihood" that a jury "could" have been affected) than *Brecht* harmless error ("substantial and injurious effect or influence" on the verdict), we go only with the lesser standard and ignore *Brecht*. *See also Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013) ("*Napue* requires us to determine only whether the error *could* have affected the judgment of the jury, whereas ordinary harmless error review requires us to determine whether the error *would* have done so."). We decided this "[e]ven though th[e] case comes to us on habeas review." *Hayes*, 399 F.3d at 985.

But this disregard of *Brecht* ignores the difference between direct and habeas review. As the Court has recognized, "States [have a] 'powerful and legitimate interest in punishing the guilty,'" and "[g]ranting habeas relief to a state prisoner 'intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority.'" *Brown v. Davenport*, 596 U.S. 118, 132 (2022) (simplified). In the wake of an unprecedented "exploding caseload" in state habeas petitions, *Brecht* was part of an effort "to develop doctrines aimed at returning the Great Writ closer to its historic office." *Id*. at 131–33 (simplified). Thus, the Court emphasized that using the standard of review for a constitutional trial error on direct appeal was "inappropriate for use in federal habeas review of final state-court judgments." *Id*. at 133. In making this determination, "the Court stressed that undoing a final state-court judgment is an extraordinary remedy, reserved for only extreme malfunctions in the state criminal justice system and different in kind from providing relief on direct appeal." *Id*. (simplified). In addition, the Court warned against setting aside a state conviction based "on nothing more than speculation that the defendant was prejudiced by trial error,"

which gives "short shrift to the State's sovereign interest in its final judgment." *Id*. (simplified).

Applying the *Napue* materiality standard without the backstop of *Brecht*'s harmless-error analysis is exactly the type of federal intrusion into state convictions the Court has warned against. Consider this case. By analyzing *Napue*'s materiality standard alone—which is normally reserved for direct appeals—the majority grants Clements's petition based merely on *any reasonable likelihood* that a jury's decision *could* have been affected by Boeker's false testimony. That's speculation on top of conjecture. Never mind the overwhelming evidence of Clements's guilt. Never mind that Boeker's alleged false testimony had almost nothing to do with Clements's aggravated kidnapping convictions. And never mind that Boeker's credibility was thoroughly vetted at trial.

While I follow our precedent, *Hayes* needs to be re-examined. After *Brown* and the near unanimous decision of other circuit courts, it's now clear we are on the wrong side of this lopsided split.

## II.

No doubt this case is thorny because an unreliable informant testified at trial. But Boeker's testimony was limited and not material to the verdict here. However much we squint, Boeker's checkered testimony cannot overcome the overwhelming evidence of Clements's guilt at trial. And we cannot punish one county's use of a questionable informant program through this habeas petition. I thus would have affirmed the district court across the board.